UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
ROBERT SUTHERS and NIWANA
MARTIN,

                                Plaintiffs,                        05 Civ. 4158 (PKC)

               -against-

                                                MEMORANDUM
                                              AND ORDER

AMGEN INC.,

                                Defendant.
-----------------------------------------------------------x

P. KEVIN CASTEL, District Judge:

        Plaintiffs Robert Suthers and Niwana Martin are courageous individuals who participated in a research trial for an experimental treatment for Parkinson's Disease. The decision to participate in the trial was no small matter. It was accompanied by invasive surgery to implant a pump in the abdomen and catheters into the brain in order to deliver the treatment. Each knew that there was a 50/50 chance of receiving nothing more than a placebo through the first six months of the trial.

        Though plaintiffs did receive placebos for the first six months of the study, Mr. Suthers and Ms. Martin eventually received the experimental treatment as part of a second follow-on study, and viewed it as greatly relieving their symptoms. The medical researcher supervising their participation reports that Mr. Suther was able to walk up to two miles a day and Ms. Martin was able to walk and run and had an improved sense of smell and greater control over facial muscles. To their disappointment and, in their view, physical detriment, the experimental trials have been discontinued.

They now bring suit seeking to compel the sponsor of the trial to resume the treatment. The sponsor, Amgen, Inc. ("Amgen"), maintains it had a legal right to terminate the experimental trials and, indeed, an ethical duty to do so because of data indicating that the treatment was neither safe nor effective.

By way of background, the experimental treatment at issue introduces into the brain a neurotrophic factor, specifically, glial-derived neurotrophic factor ("GDNF"). It holds the potential of stimulating the regeneration of the neurons that produce dopamine, a chemical that is present at diminished levels in those suffering from Parkinson's Disease.

Amgen selected New York University Medical Center ("NYU") as one of the investigation centers that would conduct independent studies into the safety and efficacy of GDNF. In that role, NYU recruited Mr. Suthers and Ms. Martin, and determined them eligible to participate. Mr. Suthers and Ms. Martin underwent the implantation surgery. As noted, they initially received placebos in a double-blind study. Thereafter, they were permitted to participate in an open label (i.e., not blind) study in which they were treated with GDNF.

Amgen terminated the second study when it discovered that the GDNF treatment produced antibodies that potentially neutralized the human body's naturally produced GDNF and risked worsening a patient's condition. It also received test data indicating that administration of GDNF in primates caused neurotoxic responses, and in humans yielded no statistically significant results over a placebo. Plaintiffs, supported by several medical researchers, believe that Amgen needlessly overreacted to the data, and that GDNF is safe and beneficial to many with advanced Parkinson's Disease, including themselves.

Plaintiffs commenced this action on April 26, 2005, naming Amgen as the sole defendant. This Court's jurisdiction is premised on diversity of citizenship, and none of

plaintiffs' causes of action arise under federal law. Proceeding by order to show cause, the plaintiffs move for a preliminary injunction requiring defendants to "provide [the physician who conducted the research study at NYU] with GDNF" and "to allow him to administer it to plaintiffs . . . ." Neither plaintiff has received GDNF treatment since September 2004.

Plaintiffs advance three legal theories to support their application for an injunction.[1] First, they claim that GDNF is beneficial to them, and that Amgen contracted with them to supply GDNF so long as it proved to be beneficial. Second, they argue that Amgen made promises, which they relied upon to their detriment by having the surgery necessary in order to deliver GDNF to their brains; these promises, they argue, are enforceable under a theory of promissory estoppel. Third, they assert that Amgen owes them a fiduciary duty, and has breached that duty by unreasonably denying them access to GDNF. Amgen denies that it made any such enforceable promises to the plaintiffs and denies that it stands in the position of a fiduciary.

On May 26, 2005, I held a hearing on plaintiffs' motion. Each side relied upon written, sworn proof and other documentary evidence, and elected not to call live witnesses. For the reasons set forth below, I conclude that, as to the three claims asserted, plaintiffs have shown neither a likelihood of success nor a sufficiently serious showing of merits to warrant the extraordinary relief of a preliminary injunction. Therefore, I deny plaintiffs' motion.

The Research Trials of GDNF

GDNF is a naturally occurring protein found in the human body. It stimulates the neurons that produce dopamine, a chemical that is produced in lower amounts by persons

---

[1]    In addition to the claims asserted on this motion, plaintiffs allege claims for breach of the implied covenant of good faith and fair dealing, violation of New York General Business Law § 349 and negligence. (Complaint ¶¶ 93-105)

with Parkinson's Disease.[2]  A Colorado biotechnology company, Synergen Inc., developed a recombinant form of GDNF as a possible treatment for Parkinson's Disease.  (Complaint ¶ 11)  Seeing promise in GDNF's potential to treat the disease, Amgen purchased Synergen Inc. in 1994 for approximately $250 million.  (Perlmutter Aff. ¶ 5)  According to Michael Hutchinson, M.D., Ph.D., researchers were "confounded by the issue of how to effectively deliver [GDNF] to the human brain," until Dr. Steven S. Gill, neurosurgeon at Frenchay Hospital in Bristol England, devised a process by which a system of pumps and catheters implanted in the patient delivered GDNF directly to a patient's brain.  (Hutchinson Cert. ¶¶ 10-13)  In 2000 and 2001, Amgen supported two open-label studies into this method for delivering GDNF.  (Perlmutter Aff. ¶¶ 15-18)

Based on the apparent clinical improvements in these small studies, in 2003 Amgen sponsored a "randomized, double-blind, placebo-controlled clinical trial of GDNF . . . [of] patients with advanced Parkinson's disease. . . ."  (Perlmutter Aff. ¶ 19)  Amgen identified the study with protocol number 20020168 ("the '168 Study").

Amgen selected eight sites to participate in the '168 Study.[3]  (Masterman Aff. ¶ 8)  NYU was one of the participating institutions, and Dr. Hutchinson served as the site's principal investigator.  (Masterman Aff. ¶ 8; Hutchinson Cert. ¶¶ 1, 16)  The protocol for the '168 Study indicates that the principal investigators were to determine the eligibility of study participants.  ('168 Study Protocol at 21-23)  According to the affidavit of Donna Mas-

---

2    The Complaint describes Parkinson's Disease as a "progressive neurodegenerative disorder characterized by the loss of dopaminergic neurons in the brain and resulting tremors, shaking, slow movement, and muscle stiffness and rigidity."  (Complaint ¶ 8)  According to affidavits submitted by individuals with Parkinson's Disease, the condition negatively affects their overall physical feelings, facial expressions, sense of smell and hearing, motor skills, and energy levels.  (Suthers Cert. ¶¶ 20-21, 23; Martin Cert. ¶ 19; Jackson Cert. ¶¶ 17-18; Thacker Cert. ¶ 18)

3    The eight sites were the University of Chicago, New York University Medical Center, the University of Virginia, Duke University, Oregon Health Sciences University, Toronto Western Hospital, Frenchay Hospital in Bristol England and the University of Minnesota.  (Masterman Aff. ¶ 8)  The University of Minnesota enrolled no patients.  (Masterman Aff. ¶ 8)

terman, M.D., the associate director of medical sciences at Amgen, patients in the '168 Study "were largely recruited from the patient populations of the principal investigators." (Masterman Aff. ¶ 7) There is nothing in the record or in the parties' arguments indicating that Amgen directly recruited the plaintiffs or any other participants.

As is the case with trials of candidate drugs or treatments, the '168 Study was designed to ensure the independence of the investigators and their research institutions from the influence of the sponsor of the trial. The '168 Study Protocol provided for confidentiality of the study participants' identities. ('168 Study Protocol at 53-54) Patients were identified to Amgen only by their initials, or by a study subject number. ('168 Study Protocol at 53)

The plaintiffs in this action, Mr. Suthers and Ms. Martin, were two of the participants in the '168 Study. Under regulations known as the "Common Rule," 45 C.F.R. § 46.101 et seq., a subject participating in a human research trial must provide his or her informed consent.[4] The plaintiffs signed such a consent document. (Suthers Cert. ¶ 10; Martin Cert. ¶ 10) In the case of the '168 Study, it was a 22-page document, each page of which bears the heading "Office of Institutional Board of Research Associates, NYU School of Medicine," and notes that "[t]he purpose of the research is to determine the potential benefits of liatermin in Parkinson's disease and to find out if patients can tolerate any potential side effect of liatermin."[5] ('168 Consent Doc. at 1) It describes the process by which catheters are inserted into the patient and placed into the part of the brain affected by Parkinson's Disease. ('168 Consent Doc. at 2) It notes that subjects will be treated either with GDNF or a

---

[4]  "On June 18, 1991, seventeen Federal Departments and Agencies . . . adopted a common set of regulations known as the *Federal Policy for the Protection of Human Subjects or 'Common Rule.'* The design of these regulations is based on established, internationally recognized ethical principles. The 'Ethical Principles and Guidelines for the Protection of Human Subjects of Research,' known as the *Belmont Report*, describe the ethical principles on which the regulations are based." (http://www.ed.gov/policy/fund/guid/humansub/overview.html).

[5]  The name "liatermin" is used interchangeably with Amgen's GDNF.

placebo in the form of "a weak salt solution." ('168 Consent Doc. at 2) "It is expected that your participation in this study will take a minimum of 10 months (a 3-month eligibility evaluation period, 6 months of receiving liatermin or placebo, and a 1-month follow-up)." ('168 Consent Doc. at 3) ('168 Consent Doc. at 9) The consent document also informed the participant of the possibility that the study may be terminated by its sponsor:

> The Principal Investigator may also decide to withdraw you from the study under certain circumstances. Some possible reasons for withdrawing a subject from the study would be deteriorating health or other conditions that might make continued participation harmful to you. These include events such as: 1) a serious adverse reaction to drug therapy; 2) the need for treatment that is not allowed in the study; <u>or</u> 3) <u>termination or cancellation of the study by the sponsor</u>.

('168 Consent Doc. at 20) (emphasis added).

The '168 consent document held open the possibility that once the study concluded, all participants might be eligible to receive GDNF: "Participants who complete 6 months of treatment may be invited to participate in a separate extended treatment study, which guarantees, if you are eligible to be enrolled, that you will receive liatermin and not a placebo." ('168 Consent Doc. at 3)

Amgen labeled this second study with protocol number 20030160 ("the '160 Study"). The '160 consent document indicated that participants would receive GDNF for a finite period of 24 months, although it states that participants "may be able to receive liatermin for a longer time." ('160 Consent Doc at 3) It also disclosed that a study participant may be withdrawn from the study by the principal investigator, in the event of "termination or cancellation of the study by the sponsor." ('160 Consent Doc. at 24) Further, the '160 consent document explicitly states that "Amgen, Inc. and/or Medtronic Inc. may decide to stop the study at any time." ('160 Consent Doc. at 23)

Mr. Suthers and Ms. Martin were deemed eligible to participate in the '160 Study and signed the consents for that study. Mr. Suthers received six doses of GDNF between March 30, 2004 and August 10, 2004, during which time he states that he "experienced significant improvement" in his physical and cognitive conditions. (Suthers Cert. ¶¶ 16, 20) Ms. Martin received her first treatment on April 4, 2004, with subsequent doses scheduled for the first week of each month. (Martin Cert. ¶ 15) Like Mr. Suthers, she states that she improved physically and mentally. (Martin Cert. ¶ 19)

Doubts Emerge About GDNF and the Research Trials Are Terminated

While the '160 Study was underway, Amgen became increasingly concerned that GDNF was not a safe or efficacious method of treating Parkinson's. In June 2004, the '168 Study, in which 17 patients received GDNF and 17 others received a saline-based placebo, was unblinded, and Amgen concluded that the data reflected no statistically significant clinical improvement for those patients receiving GDNF. (Perlmutter Aff. ¶¶ 26-29; Harper Aff. ¶ 14; Masterman Aff. ¶ 13) According to Perlmutter, Amgen nevertheless proceeded with GDNF development and considered a reformulated trial, possibly including increased GDNF dosages. (Perlmutter Aff. ¶¶ 32-34)

In August 2004, Amgen received reports that two patients treated with GDNF had developed neutralizing antibodies. (Perlmutter Aff. ¶ 37) According to Steven J. Swanson, Ph.D., the director of Amgen's clinical immunology department, antibodies are produced by the immune system and bind to foreign substances that the antibodies recognize as potentially harmful. (Swanson Aff. ¶ 7) The presence of antibodies that neutralize naturally occurring GDNF could worsen the effects of the disease and result in brain degeneration and damage to organs, including the kidneys and genitals. (Swanson Aff. ¶¶ 8-9) A total of 10 percent of participants, 3 out of 34, in the study developed neutralizing antibodies. (Perlmut-

ter Aff. ¶ 41)  Amgen also was concerned by the results of a primate toxicology study, which found that cerebellar lesions arose in four of 15 primates receiving GDNF.  (Perlmutter Aff. ¶ 42; Harper Aff. ¶ 28)  Among primates who received high GDNF doses for six months, three of five showed an "unusual pattern of cerebellar toxicity."  (Perlmutter Aff. ¶ 44)  The findings that GDNF was causing cerebellar toxicity among primates, combined with concerns as to the low efficacy of GDNF treatment and the implications of neutralizing antibodies, prompted Amgen on August 26, 2004 to halt the human trials.  (Perlmutter Aff. ¶ 50)  Amgen notified the Food and Drug Administration ("FDA") and its Canadian counterparts of its decision.  (Masterman Aff. ¶ 34)  Amgen notified principal investigators and participants of this decision on September 1, 2004.  (Perlmutter Aff. ¶ 52)

Amgen's decision was met with opposition from participants in the clinical studies, and from some of the principal investigators who were administering GDNF to the study participants.  In October 2004, Amgen representatives attended a conference on GDNF, where physicians, investigators, and advocacy groups expressed disagreement with the decision to halt clinical studies.  (Harper Aff. ¶ 42)  One of the investigators who vigorously disagreed with Amgen's decision was Dr. Hutchinson.  Hutchinson states that he observed improvements in the plaintiffs' conditions, and that he continues to believe that GDNF was a safe and beneficial treatment for Parkinson's Disease.  (Hutchinson Cert. ¶¶ 25-30, 32, 36)  Richard Penn, M.D., the co-principal investigator in the University of Chicago's GDMF clinical trial, states that the study participants at the Chicago location experienced significant improvement with clinically administered GDNF.  (Penn. Cert. ¶¶ 23-25)  Penn states that he believes that GDNF is a safe and beneficial Parkinson's treatment.  (Penn Cert. ¶¶ 26, 32)  In addition, a joint affidavit submitted by four University of Kentucky researchers

who participated in GDNF trials contends that GDNF is a promising means of treating Parkinson's Disease, and can be safely and efficaciously administered. (Gash Aff. ¶ 6)

Not all principal investigators participating in the '160 and '168 studies disagreed with Amgen's decision to halt GDNF treatment. The principal investigators at trials occurring at the University of Virginia, Oregon Health & Science University, the University of Toronto, and Duke University all have submitted affidavits stating their opinions that Amgen acted properly and prudently by discontinuing the supply of GDNF. (Wooten Aff.; Nutt Aff.; Lang Aff.; Stacy Aff.) The disagreement over clinically administered GDNF's effectiveness prompted a January 11, 2005 meeting between GDNF investigators, Amgen representatives, and officials at the FDA. The FDA recounted the events of the meeting in a memorandum dated February 4, 2005 ("Feb. 4 Mem."). (Attached at Tracey Dec. Ex. 18) "Amgen's stated role in the meeting was to listen to the Investigators and the Agency, to provide support for the discussion (with factual information), and to facilitate the meeting, as required." (Feb. 4 Mem. at 1) The FDA stated that its role was to "facilitate discussion" and it noted that "[t]he decision to withdraw was, and remains, a decision made by Amgen." (Feb. 4 Mem. at 1) The memorandum also summarized previous communications between Amgen and the FDA, noting that if data did not clearly direct whether to provide GDNF to patients already receiving it, "then it was the company's prerogative as to how to proceed." (Feb. 4 Mem. at 2) The FDA also noted "that in some prior situations with other drugs, when a drug has been discontinued, a company may have chosen to allow patients that are already receiving drug [sic] to continue to do so for an extended period of time, and that the FDA has often permitted such proposals to go forth." (Feb. 4 Mem. at 2) Following the FDA meet-

ing, Amgen announced that it would not provide GDNF to the plaintiffs on a "compassionate use" basis, contending that GDNF did not work.[6]  (Complaint ¶¶ 52-53)

<u>Preliminary Injunction Standard</u>

       In order to obtain a preliminary injunction the plaintiffs must show (a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in favor of the party seeking preliminary relief.  <u>See</u>, <u>e.g.</u>, <u>Brooks v. Giuliani</u>, 84 F.3d 1454, 1462 (2d Cir. 1996); <u>Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.</u>, 596 F.2d 70, 72 (2d Cir. 1979).

       The injunction that plaintiffs seek would alter, rather than maintain, the status quo.  Plaintiffs were last administered GDNF in August 2004.  A movant is required to make "a more substantial showing of likelihood of success, both as to violation and risk of recurrence, whenever the relief sought is more than preservation of the status quo."  <u>SEC v. Unifund SAL</u>, 910 F.2d 1028, 1039 (1990).  <u>See also</u> <u>Tom Doherty Associates, Inc. v. Saban Entertainment, Inc.</u>, 60 F.3d 27, 34 (2d Cir. 1995) (" [W]e have held that a mandatory injunction should issue 'only upon a clear showing that the moving party is entitled to the relief requested, or where extreme or very serious damage will result from a denial of preliminary relief.'), quoting <u>Abdul Wali v. Coughlin</u>, 754 F.2d 1015, 1025 (2d Cir.1985).

<u>Breach of Contract</u>

       Plaintiffs argue that they have made a sufficiently strong showing of merits on a claim that Amgen breached a contract to supply them with GDNF, so long as the treatment was safe and effective.  They argue that they have demonstrated that the treatment is safe and

---

[6]    "Compassionate use" is the phrase sometimes used to describe FDA permission to distribute experimental drugs to a specific category of patients in "extraordinary circumstances."  (May 26 Tr. at 22)

effective and, hence, Amgen should be compelled to supply GDNF to them.[7]  Under New York law, a plaintiff alleging a breach of contract claim must set forth the specific terms of the agreement, the consideration, the performance by plaintiffs, and the basis of the alleged breach of the agreement by the defendant.  Furia v. Furia, 116 A.D.2d 694, 695, 498 N.Y.S.2d 12, 13 (2d Dep't 1986).[8]  Plaintiffs argue that they have established a likelihood of success in proving such a contractual promise.  They assert that consideration is supplied by their agreement to participate in the research trials, and their performance is established by actually undergoing the surgery and faithfully participating in the trials.  Plaintiffs argue that the contractual promise has been breached by Amgen because the treatment is safe and effective, yet Amgen has refused to supply it.

In support of their claim of an enforceable contractual promise, neither Mr. Suthers nor Ms. Martin points to any direct oral or written communications with Amgen. Rather, they rely upon a generalized understanding that they acquired from their conversations with a principal investigator, Dr. Hutchinson of NYU, and the language of the NYU consent documents that they executed.  It is a basic principle of contract law that the unilateral understandings of one party, no matter how subjectively reasonable, are insufficient to form the basis of a contractual promise.  Di Giulio v. City of Buffalo, 237 A.D.2d 938, 939, 655 N.Y.S.2d 215, 217 (4th Dep't 1997).  To have a valid, enforceable contractual obligation, there must be a meeting of the minds.  I.G. Second Generation Partners, L.P. v. Duane Reade, __ A.D.3d __, 793 N.Y.S. 2d 379, 382 (1st Dep't 2005).  Of course, a bilateral under-

---

[7]    Plaintiffs urge that the allegation of the existence of a contractual promise to supply GDNF if safe and effective requires a court to determine whether the treatment is safe and effective.  To the contrary, it first requires the Court to determine, in the preliminary injunction context, whether the contractual commitment was made.  If the evidence does not support the existence of the contractual promise, there is no need to reach the issue of whether the treatment is safe and effective.

[8]    The agreement with NYU was entered into in New York and the treatments were received in New York. Both sides cite New York law as support for their respective positions and, in the context of this motion, I will apply it to the claims asserted.  See Tri-State Employment Services, Inc. v. Mountbatten Sur. Co., Inc., 295 F.3d 256, 260-61 (2d Cir. 2002), citing In re Allstate Ins. Co., 81 N.Y.2d 219 (1993).

standing need not be expressed and may be implied in fact.  Miller v. Schloss, 218 N.Y. 400, 406-07, 113 N.E. 337, 338-39 (1916).

Plaintiffs point to the language of the consent document in the '168 Study: "Participants who complete 6 months of treatment may be invited to participate in a separate extended treatment study, which guarantees, if you are eligible to be enrolled, that you will receive liatermin and not a placebo." ('168 Consent Doc. at 3)  Fairly read, this is nothing more than a promise that in the next phase of the study, no participant would receive placebo, and all would receive GDNF.  It is not a restriction on Amgen's ability to terminate the study.  Indeed, as previously noted, plaintiffs executed a second consent prior to being admitted to the '160 Study.  This second consent document makes it plain that "Amgen, Inc. and/or Medtronic Inc. may decide to stop the study at any time." ('160 Consent Doc. at 23)

Plaintiffs also rely upon statements contained in Dr. Hutchinson's reply certification, submitted on this motion:

> I forcefully reject Amgen's suggestion that I made promises to my patients that they would receive GDNF no matter what the results of the study.  This makes no sense whatsoever and would be entirely out of character.  For example, one of my patients asked me if he would continue to receive GDNF after the study was completed, and I told him that if the study was successful, Amgen would of course keep him on the drug.  He asked me to confirm this with Amgen, and I telephoned the director of the project, Michael Traub, who confirmed this.

(Hutchinson Reply Cert. ¶ 62)  Hutchinson acknowledges that he did not view Amgen's obligation to continue the study as an unconditional one.  He merely attests that he told one participant, not identified as either plaintiff, that Amgen would want to continue the GDNF trial if it proved successful.  Amgen confirmed this to Hutchinson, who, in turn, confirmed it to a patient.  Notably, Dr. Hutchinson does not offer any hint as to the timing of the conversation.  At oral argument, plaintiffs' counsel was not able to fill the missing gaps.  (May 26 Tr. at 13-14)

Dr. Hutchinson also states, "At the conclusion of the placebo phase, those subjects would be, in the words of the protocol and the informed consent document, guaranteed they would receive GDNF indefinitely." (Hutchinson Cert. ¶ 18) Yet the very documents to which he refers contain no such guarantee. Indeed, none of the relevant documents could be fairly described as a contract between the plaintiffs and Amgen. The Study Protocol and the Clinical Trial Agreement were binding agreements between Amgen and NYU. The consent documents define the rights of the plaintiffs in their relationship to NYU.

Plaintiffs have endeavored to characterize Dr. Hutchinson as the agent of Amgen with the authority to bind it. On this argument, as the facts are presented at the preliminary injunction stage, plaintiffs have not made a clear or substantial showing of sufficiently serious questions of merits in their favor. The Clinical Trial Agreement between Amgen and NYU makes clear that Hutchinson and NYU performed as independent contractors, and not as agents of Amgen:

> In the activities connected with the Study, Institution agrees to act as an independent contractor without the capacity to legally bind Amgen or Medtronic and also agrees that it is not acting as an agent or employee of Amgen or Medtronic.

('160 Clinical Trial Agreement ¶ 20 at page 10; '168 Clinical Trial Agreement ¶ 20 at page 9, attached at Tracey Dec. Ex. 24). See also 21 C.F.R. § 312.60.

Plaintiffs do not fair better on a claim of apparent authority. "Essential to the creation of apparent authority are words or conduct of the principal, communicated to a third party, that give rise to the appearance and belief that the agent possesses authority to enter into a transaction. The agent cannot by his own acts imbue himself with apparent authority." Hallock v. State of New York, 64 N.Y.2d 224, 231 (N.Y. 1984). Thus, assuming arguendo that Dr. Hutchinson promised plaintiffs that they would receive GDNF indefinitely, the record at this stage does not contain evidence that would support a finding of sufficient show-

ing of merits in their favor in establishing words or conduct on the part of Amgen that would reasonably give rise to an appearance and belief that Dr. Hutchinson acted as Amgen's agent.

Plaintiffs agreed to the trials – and the invasive surgery accompanying them – knowing that in the '168 Study, they might receive placebos. From the consent form, they knew that their participation in the '160 Study was not a matter of right. They also knew from the consent forms for both studies that Amgen could elect to terminate the studies. ('168 Consent Doc. at 20; '160 Consent Doc. at 23) On the plaintiffs' part, their decisions to participate may have been an act of confidence in the prospects of GDNF, of selflessness in agreeing to participate in an important research project, of hopefulness borne of their frustration from the lack of success of other treatments, or some combination of these or other factors.

It is not illogical for a participant to assume that a company that has invested hundreds of millions of dollars to acquire the rights to a therapeutic treatment, and then spent millions more to test it, would want to bring the treatment to market if safe and effective. But that is a far cry from establishing a contract by which Amgen bargained away the freedom to terminate the research trials in its sole discretion. The evidence does not establish either a probability of success or a sufficiently serious question of merits to warrant an injunction.

Promissory Estoppel

New York recognizes that a party making a promise, not supported by consideration, may be estopped to deny the enforceability of the promise where another has relied upon the promise to his detriment. "To establish a viable cause of action sounding in promissory estoppel, a plaintiff must allege (1) a clear and unambiguous promise, (2) reasonable and foreseeable reliance by the party to whom the promise is made, and (3) an injury sus-

tained in reliance on the promise." <u>Rogers v. Town of Islip</u>, 230 A.D.2d 727, 727, 646 N.Y.S.2d 158, 159 (2d Dep't 1996); <u>accord</u> <u>New York City Health & Hospitals Corp. v. St. Barnabas Hospital</u>, 10 A.D.3d 489, 491, 782 N.Y.S.2d 12, 14 (1st Dep't 2004).

 Here, the plaintiffs argue that their satisfaction of the second and third elements is demonstrated by the fact that they underwent highly invasive medical procedures in order to participate in the GDNF trials. The threshold question, however, remains as to whether there exists a "clear and unambiguous promise," <u>Rogers</u>, <u>supra</u>. As discussed above, the text of the consent documents does not contain any such language promising the indefinite supply of GDNF, and Dr. Hutchinson's assertions as to his telephone call to Amgen do not establish a promise that could have induced detrimental reliance by the plaintiffs. The record on this motion does not demonstrate that there were clear and unambiguous promises by Amgen that plaintiffs would be granted ongoing GDNF treatments as consideration for their participation in the clinical studies and that Amgen would not terminate those treatments. To the contrary, the evidence at the preliminary injunction stage demonstrates that the plaintiffs knew that the trials could be terminated over their objection.

 I conclude that the plaintiffs have not made a sufficient showing of merits on the claim of promissory estoppel to warrant injunctive relief because they have failed to demonstrate a "clear and unambiguous" promise.

<u>Breach of Fiduciary Duty</u>

 Plaintiffs argue that Amgen owes them a fiduciary duty, and that duty has been breached. A fiduciary relationship arises "where one [person] is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relations." <u>Flickinger v. Harold C. Brown & Co.</u>, 947 F.2d 595, 599 (2d Cir. 1991) (citing <u>Madelblatt v. Devon Stores, Inc.</u>, 132 A.D.2d 162, 168, 521 N.Y.S.2d 672 (1st Dep't 1987)). In ascertain-

ing whether a fiduciary duty has arisen, the "focus is on whether a noncontractual duty was violated; a duty imposed on individuals as a matter of social policy, as opposed to those imposed consensually as a matter of contract agreement." Apple Records, Inc. v. Capitol Records, Inc., 137 A.D.2d 50, 55, 529 N.Y.S.2d 279, 282 (1st Dep't 1988). "[W]here a fiduciary relationship exists between parties, transactions between them are scrutinized with extreme vigilance, and clear evidence is required that the transaction was understood, and that there was no fraud, mistake or undue influence." Sepulveda v. Aviles, 308 A.D.2d 1, 8, 762 N.Y.S.2d 358, 363 (1st Dep't 2003) (alteration in original).

A fiduciary duty may arise from "special extraneous circumstances" and from a "legal duty which is due from every man to his fellow, to respect his rights of property and person, and refrain from invading them by force or fraud." Apple Records, 137 A.D.2d at 55, 529 N.Y.S.2d at 282. However, fiduciary duties do not arise solely because one party has expertise that is superior to another. See Ross v. FSG PrivatAir, Inc., 2004 WL 1837366, at *6 (S.D.N.Y. Aug. 17, 2004). "[P]laintiffs must allege some factors from which a court could conclude that such a relationship has been established." Boley v. Pineloch Associates, Inc., 700 F. Supp. 673, 681 (S.D.N.Y. 1981). "Furthermore, where the parties' contract forms both the foundation and boundary of their relationship, fiduciary responsibilities have not attached." Ross, 2004 WL 1937366, at *6.

The existence of a fiduciary duty may raise a factual question to be submitted to the trier of fact. See Sonnenschein v. Douglas Elliman-Gibbons & Ives, 274 A.D.2d 244, 247 (1st Dep't 2000). New York courts also have not hesitated to find fiduciary duty claims deficient when a plaintiff has not pleaded or proved facts demonstrating a fiduciary duty or "any relationship approaching privity." Columbia Memorial Hospital v. Barley, 16 A.D.3d 748, 749, 790 N.Y.S.2d 576, 577 (3d Dep't 2005); see also Doe v. Holy See (State of Vatican

City), 793 N.Y.S.2d 565, 2005 N.Y. Slip Op. 02905 (3d Dep't Apr. 14, 2005) (no fiduciary relationship between local church member and the Vatican).

        At argument, plaintiffs' counsel acknowledged that no New York court has recognized a fiduciary relationship between the sponsor of a research trial and a participant in that trial. Plaintiffs urge that this Court adopt the reasoning of the Maryland Supreme Court's decision in Grimes v. Kennedy Krieger Inst. Inc., 782 A.2d 807, 366 Md. 29, 73-74 (2001). In Grimes, the Maryland Supreme Court found that medical researchers owed a duty sounding in tort to children whose parents had been induced to live in homes containing lead paint so that the paint's effects could be measured against a control population without such exposure. The researchers in Grimes designed the study, recruited the subjects, and obtained their consent. Understandably, the Maryland Supreme Court was concerned about a "vulnerable research subject" who may have been provided information to induce consent that was "incomplete in a material respect." Grimes concluded that there was a duty to the research subject independent of the consent, and that a consent form could not be utilized to immunize the researchers from liability. The Grimes court did not characterize the duty as that of a fiduciary or offer any other characterization.

        The dissimilarities between this case and Grimes are many. Here, a therapeutic treatment was tested in a manner so that the tests would comply with FDA regulations. To avoid the potential that a pharmaceutical company with a financial interest in the outcome would place participants at risk of needless harm, independent research institutions and their physicians conducted the clinical trials. In Grimes, the participants were in direct contact and privity with the party who was found to have owed them a duty. Here no claim is asserted against the principal investigator, Dr. Hutchinson, or NYU, with whom plaintiffs had their

dealings.  I need not and do not decide the contours of the duty Dr. Hutchinson or NYU may

have owed to plaintiffs.[9]

The California Supreme Court has had occasion to address the fiduciary respon-

sibilities of medical researchers.  In Moore v. Regents of University of California, 51 Cal.3d

120, 271 Cal. Rptr. 146 (1990), cert. denied, 499 U.S. 936 (1991), the plaintiff underwent

treatment for hairy-cell leukemia; his treating physician realized that the combination of sub-

stances in the plaintiff's blood held great scientific and commercial prospects.  Id., 51 Cal. 3d at

125-26, 271 Cal. Rptr. at 148.  The physician proceeded to aggressively withdraw samples of

"blood, blood serum, skin, bone marrow aspirate, and sperm," as well as part of the plaintiff's

spleen, ultimately establishing an independent cell line and receiving a patent on that cell line

in favor of himself and a researcher which was assigned to the medical center.  Id., 51 Cal. 3d

at 126-27, 271 Cal. Rptr. at 148-49.  The California court distinguished the fiduciary duties of

the treating physician from the responsibilities of the physician's supervisors and others profit-

ing from the research:

> The Regents [who operated the medical center], Quan [a researcher employed by the
> medical center], Genetics Institute [a licensee], and Sandoz [a pharmaceutical company
> and licensee] are not physicians.  In contrast to Golde, none of these defendants stood in
> a fiduciary relationship with Moore or had the duty to obtain Moore's informed consent
> to medical procedures.  If any of these defendants is to be liable for breach of fiduciary
> duty or performing medical procedures without informed consent, it can only be on ac-

---

[9]     One bioethicist has criticized the suggestion that medical researchers in human trials owe a fiduciary duty
to participants:

> [T]he very nature of research precludes a fiduciary relationship between investigators and
> subjects. By definition the researcher's goal is not the betterment of any particular partici-
> pant. It is the successful completion of the research, in hope of helping future patients.
> This is not a situation in which a standard fidelity obligation requires a transient compro-
> mise, such as a decision whether to violate patient confidentiality to warn a third party
> that the patient poses a danger. Rather, a completely different allegiance permeates the re-
> lationship. The investigator's entire purpose, his number one loyalty, is already pegged on
> something other than the patient. It is to the protocol.

E. Haavi Morreim, Litigation in Clinical Research: Malpractice Doctrines Versus Research Realities, 32
J.L. MED. & ETHICS 474, 477 (2004).  See Greenberg v. Miami Children's Hospital Research Institute,
Inc., 264 F. Supp. 2d 1064 (S.D. Fla. 2003) (declining to find a fiduciary duty to disclose researchers'
economic interests to, among others, research participants in the absence of an allegation of "acceptance
of trust" by defendants).

count of [the treating physician's] acts and the basis of a recognized theory of secondary liability, such as respondeat superior.

Id., 51 Cal. 3d at 133, 271 Cal. Rptr. at 154.

The FDA tightly regulates how research trials are to be conducted. For instance, 21 C.F.R. § 312.50 governs the process by which a trial's sponsor selects and monitors principal investigators, such as Dr. Hutchinson, and 21 C.F.R. § 312.60 sets forth the duties of principal investigators. One provision of the Common Rule, 21 C.F.R. § 50.25(b)(2), anticipates that a study sponsor may seek the right to terminate a subject's participation without his consent:

> When appropriate, one or more of the following elements of information shall also be provided to each subject: . . . (2) Anticipated circumstances under which the subject's participation may be terminated by the investigator without regard to the subject's consent.[10]

Plaintiffs offer no arguments to define how Amgen's fiduciary duty would be cabined. New York law has long held that the duty of a fiduciary is one of "undivided loyalty" that should be applied with "uncompromising rigidity." Meinhard v. Salmon, 249 N.Y. 458, 464, 164 N.E. 545, 546 (1928) (Cardozo, C.J.). Could a hypothetical fiduciary, with a strong and acknowledged profit motive of its own, tolerate the administration of an unproven treatment or a placebo to the person to whom this duty of "undivided loyalty" is owed? The fiduciary duty envisioned by the plaintiffs would presumably mean that if it were in a study participant's best interests to continue a clinical study, then the sponsoring company would be without power to terminate it without risking a finding of breach. Such a standard provides no guidance on a host of issues, including how long the sponsor's fiduciary duty would extend, whether the research institution would also have a duty to continue treating the study

---

[10] The FDA regulations expressly provide that they are not intended to preempt state laws governing informed consent by patients. 21 C.F.R. § 50.25(c). I do not otherwise address issues of federal preemption, which have not been raised by the parties. See J.N. Gibbs, State Regulation of Pharmaceutical Clinical Trials, 59 Food & Drug L. J. 265 (2004).

participant indefinitely, and whether the fiduciary obligations of the study's sponsor would survive the decision of the patient to cease his or her relationship with the research institution.

Here, the trial was consciously structured to foster the independence and objectivity of the research institutions and principal investigators conducting the study. The independence ensures that the sponsoring company does not manipulate the study to the ultimate detriment of those who may someday use the treatment. Attempts by a sponsoring company to separately communicate with the participants in a trial once the trial is underway would likely undermine the trial's independence. In this case, there is no basis in fact or law to impose a fiduciary duty running from the sponsor of an independent study to participants who it does not select, has not met, and about whom it may not know the details of their medical conditions. The constraints upon the conduct of the sponsoring company include FDA regulations and the contractual commitments that it undertakes, as well as ethical constraints imposed internally and through the pressures of the marketplace.

Irreparable Harm

Plaintiffs argue that they are being irreparably harmed each day that they are denied access to a treatment that would drastically improve the quality of their daily lives. Defendants vigorously dispute plaintiffs' ability to demonstrate immediate irreparable injury because, much to their regret, GDNF did not prove to be efficacious in human trials and, most importantly, neutralizing antibodies were found in 3 of 34 trial participants. "The decision to grant or to deny a preliminary injunction depends in part on a flexible interplay between the likelihood of irreparable harm to the movant and the court's belief that there is a 'reasonable certainty' that the movant will succeed on the merits at a final hearing." Packard Instrument Co. v. ANS, Inc., 416 F.2d 943, 945 (2d Cir. 1969) (per curiam). Because an in-

sufficient showing of merits has been made, it is not necessary for me to resolve these hotly contested issues of whether plaintiffs would likely benefit, or needlessly face danger, from the resumption of treatments with GDNF.

Conclusion

Plaintiffs participated in research trials in GDNF in the utmost of good faith and with every hope for their success. It was in Amgen's financial interest that the research trials prove successful. In undertaking the trials, Amgen retained independent researchers to ensure that they were free from the influence of its own self-interest in the success of the trials. The independent researcher in this case, Dr. Hutchinson, presented to plaintiffs consent documents that acknowledged Amgen's right to terminate the research trials. Plaintiffs signed these documents and do not presently claim that they were coerced or misled into doing so. At the preliminary injunction stage, plaintiffs have made an insufficient showing of merits on their claims that Amgen gave up the right to terminate the trials in its unfettered discretion. The plaintiffs' motion for a preliminary injunction is DENIED.

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
June 6, 2005